We have one more case this afternoon. It's number 15-2938, United States v. Bitterman, Mr. Boyle and Mr. Gowey. Whenever you're ready, sir. May it please the court, my name is Dennis Boyle and I represent the appellant, Craig Bitterman. I would respectfully request three minutes for rebuttal. That's fine. Your Honor, this case involves two issues, but due to the limited nature of the time, I think I will only address the Brady issue as it is today. As the court is well aware, in order for a Brady violation to exist, three things are necessary. First, that evidence was withheld. Second, that that evidence was exculpatory. And third, that the evidence was material in the outcome of the case. You're saying what was not introduced? IRS agent Huston testified about Commonwealth's handbook. Is that correct? That's correct, Your Honor. Didn't you introduce a document that included nearly identical language to that handbook? Your Honor, in terms of the best evidence objection, Mr. Huston testified to a document. He described the document as a document that advised people as to how to evade taxes. The document we introduced, first of all, there's no indication that was the same document Mr. Huston was referring to at all. In fact, I think the characterization of the document would be completely different. My point is, I'm trying to determine the prejudice here. Was the document that you introduced, did it have nearly identical language? It had some language that was similar, but it had other language that was completely different, Your Honor. What was different? Well, the document we introduced specifically advised people that they needed to pay their taxes, that they could not use these products to evade taxes. Let's look at the actual language, all right? Okay. Huston said they had a paragraph that talked about, Be careful what you do and don't say, don't drive nice flashy cars. Don't tell, don't tell people you don't pay taxes. Informants are lurking everywhere. That's at your joint appendix. It's 1617 and 1613. What you introduced in the CTC said, If your desire is to obtain some peace of mind, it is essential to maintain a low profile. Although it may be your constitutional right to not say or do anything that will rouse suspicion. This includes driving vehicles that would be considered high profile, telling people that you don't pay taxes, or living a lifestyle of luxury. If you do, you will become a target, et cetera. Informants are lurking everywhere. That's from the joint appendix at 5859 from the home study course. Now, Agent Huston said it in few words, but it looks to me like those are saying exactly the same things. Would you acknowledge that those are saying the same thing? I would acknowledge that they say very similar things. They're clearly not exact. I think the emphasis and the import that's putting on one is different than what Huston gave it. What document do you think he was referring to, if not to the CTC guide that you folks put in yourselves? I don't know what document he was referring to. It sure looks like he's talking about this exact document, doesn't it? It could be this exact document. I don't know because I don't know exactly what document he was referring to. I know that the document we put in was the manual that was presented to the CTC. The one I just quoted from, right? Correct, John. You introduced into evidence what exhibit four, which was the, let's see, a handbook and a home study course for managing directors. That was exhibit five. Is that correct? That's correct, John. And Mr. Bitterman testified about certain portions of both of those documents? That's correct. And what he testified to, did it not essentially track Special Agent Huston's testimony? I don't believe that it did. I think what Mr. Bitterman testified to was those aspects of the manual that indicated this was not a tax fraud scheme, that they needed to pay their taxes, that they needed to comply with the law, that if they didn't follow this, what CTC had told them exactly, then they would get into trouble. What Mr. Huston testified to, I believe, was that this manual was, in essence, a blueprint for committing tax evasion. But now you start out saying you wanted to talk about the Brady materials. The things we've been talking about, these fall under your best evidence rule argument, right? That's correct, John. Or is this part of your Brady argument, too, somehow? No, that's part of my best evidence argument. Okay. So if we're on the best evidence rule argument after all, let me just ask you, does the best evidence rule cover the same issues as the hearsay rule? Are they meant to cover the same things? No, I do not believe they. I think they're two completely different rules. I think the judge erred in finding the best evidence rule to be an exception to the hearsay rule. I think the hearsay rule deals with the substance of what can be admitted, and the best evidence rule deals with how that evidence is admitted. Right. Would you agree, though, if we agreed with you that this was an error, would it be harmless if we determined, indeed, the defense ended up choosing to put the best evidence in itself? To be quite candid with the court, Your Honor, it may be a harmless error. Yeah. Okay. So if the Brady argument is your best argument, I think you think it is your best pitch, because you're going to lead with it. What is it that you allege was not turned over? And if you don't mind me putting a compound question to you, also you seem to make some arguments about we were relying on assurances from the Assistant U.S. Attorney. What exactly do you say you were relying on? The Assistant U.S. Attorney, if I can go back and explain perhaps a little bit of background as to what happened exactly. Prior to the trial of Craig Bitterman, the Assistant U.S. Attorney had been involved in another trial. During the course of that trial, there were a number of e-mails. There were a number of other documents. We had a hearing before the district court where we introduced 60 documents. Later, the district court directed us to file additional documents. I believe we filed an additional 388 documents. Those were all documents that had been in the possession of the Assistant U.S. Attorney. Those were documents that went directly to the intent of our clients. Some of the documents mentioned our clients specifically. Those documents were not provided to us. The Assistant U.S. Attorney told us before trial that all exculpatory information had been provided to us. All exculpatory information was in the government's possession. Now you're getting to the point I was trying to get you to respond to. When did the Assistant U.S. Attorney make a representation to you that you believe your client relied on to his detriment? I can't remember the exact date. It was well before trial, and I think Mr. Gardy agrees that that representation was made. But the character of the representation matters, right? What exactly was said? That's correct. And what do you say was said? I believe that Mr. Gardy told us that all exculpatory information had been provided to us. So we don't know whether he said we haven't come across any other braiding material. We don't have in the record exactly what that conversation was, right? We have Mr. Gardy's testimony during the hearing that was conducted before the District Attorney where I believe Mr. Gardy acknowledged that he had intended and believed he had given us all exculpatory information. Okay. Is the information that was at issue here all documents that were associated with the crim trial? Yes, Your Honor. All the documents we rely upon were discovered and were given to us by Dads, who was a co-conspirator of Crim's. Okay. And these, you said a minute or two ago, you thought that these went to intent and therefore they were material, or at least that's what I understood your argument to be. But doesn't the information have to be exculpatory in some fashion? I believe that it is exculpatory in that when it negates the element of intent in a tax fraud case, it's exculpatory. Give us an example, if you would. What's your very best example of something from, I think there are what, 250 documents that are kind of in this category of information that you allege and that the District Court agreed were not turned over? I believe there were over 400 documents that we alleged. I thought from the District Court's analysis that we ended up with 250 potential breaking documents. Am I wrong about that? The District Court analysis did not address the first 60 documents we had entered into evidence at the time. All right. Well, from the documents that you say were not turned over, give us your best example and tell us why it's exculpatory, if you would, please. During the hearing before the District Court judge, Exhibit No. 49, I don't have the record site right here, but I can get that to the court. But it talks about, we had a long conversation with Scott Peterson over the weekend to say he is distressed and disappointed and that no one has contacted him about the June 1st raid. It's an understatement. He's seriously considering resigning as trustee. He perceives that trustee services is not communicating adequately with him, such that he is expected to simply rubber stamp documents without concern for the content, intent, and impact. Without having this information, he fears that CWTC is doing exactly what they are being accused of doing, that they are using sham trusts for the manager's benefit. He takes his fiduciary duties seriously and expects to actively function as a trustee. Okay. Assume that that's true. How does that trustee's mindset exculpate Mr. Bitterman? What the government had argued at the trial was that these were sham trusts with sham trustees who were not performing any trustee functions whatsoever. What this document shows is that there were real people who were serving as trustees and were taking their duties seriously. Also, is it logically inconsistent that you might have a trustee that was either a person of such good faith or of such ignorance that they did not want or think they were playing the role of a trustee dupe and also have it be true that Mr. Bitterman was, in fact, intending to do all the things the government accused him of doing? I think that this is circumstantial evidence as to the fact that what CTC was telling people like Bitterman was, in fact, true or at least that some people believed it was true. In other words, what we're dealing with is not the reality of the fact, but what the intent was, what the knowledge was, what the belief was. The other thing that's significant about it... Is there any indication that Mr. Bitterman ever saw that document, knew of that document, knew of that particular trustee's feelings about the role that he or she was playing? Craig Bitterman testified significantly about trustees and what he understood they were doing. I don't know that there's any reference to this particular trustee. I would also note that this document was actually faxed from Wayne Reebuck to Chris Houston, the government's star witness, the Director of Sales. Mr. Reebuck had testified that this was all a sham and that everybody knew it was a sham. This would have directly impeached the government's star witness. Why don't we hear from Mr. Gowrie and then we'll get you ready. Okay. Dr. Greenberg, do you have any questions? No, I don't have any questions. May it please the Court. My name is Vaneek Gowrie. I represent the United States government. First, with Your Honor's permission, I'd like to address the questions from the Court to Mr. Boyle regarding the assurances provided by the government in terms of all material being provided. I can point the Court to, as Mr. Boyle correctly stated, I believe there was an August 2011 post-trial hearing in which I testified and I stated I did make that assurance and I recall making that assurance. I believe the record indicates that that assurance took place in the middle of trial. So that assurance took place after the government either was concluding its case or was about to conclude its case. So it was well before trial? Pardon me? A moment ago Mr. Boyle said that occurred well before trial. That's why I was part company with Mr. Boyle, Judge Jordan. I don't believe the record indicates any other assurances from the government, aside from our standard discovery letter which states that we acknowledge our duty to produce all Brady and Jenks material. I don't recall anything else in the record, and I scoured the record again in the days leading up to today, where any other assurances were made except for those assurances. I made two assurances during trial once we found some handwritten notes. Were there about 70 boxes back at the IRS offices that were finally inspected post-trial? No, Your Honor. Those were made available over eight months before trial, Your Honor. We had an in-chamber status conference with the district court. Mr. Boyle was there as well as his co-counsel for the other defendants. I made those documents available to them, available for inspection. I indicated there were about 70 boxes taken in search warrants from Commonwealth Trust Company. And had you gone through all those boxes before trial? I mean, if somebody was from your office. Yes. It was very familiar with those documents. They didn't go through those documents, did they? No, Your Honor. Judge Greenberg, you're correct. As we stand here today, over six years since that offer was made, defense counsel and other support staff, none of the defendants themselves have ever looked at those documents sitting at IRS. But the district court decided that you, in fact, had suppressed, had not turned over or made available a significant number and hundreds of documents, right? That's correct, Judge. Those are CDs that were discovered from the current trial. That was an oversight on my part. That should have been produced in discovery. However, as early as January 2010, defense counsel was on notice about the Crim case and its applicability. In the months leading up to trial, throughout the summer of 2010, we provided special agent reports, memorandums of interview, trial transcripts that indicated computerized and electronic evidence, emails and PowerPoint presentations, most of which is the subject of the Brady claim. Yeah, but does the government really take the position that it's on defense counsel to demand to see evidence from all potentially related trials, or is it the government's responsibility to turn it over? It's the government's responsibility to turn it over, Judge. I would just argue that that evidence was, the defense counsel was on notice about the applicability of the Crim trial. We gave them plenty of materials about that segment. What's the relevance of that comment, Mr.? I apologize, sir. Is it Gowrie? Gowrie, Your Honor. Okay. I mean, you acknowledge that it was your responsibility to turn it over, so whether they knew about the Crim trial or didn't know about the Crim trial, if the obligation isn't on them and it rests on you, it rests on you, right? Yes, Your Honor. Okay. So since it does rest on the government, and the district court did say it wasn't turned over, like suppressed is a word that might be loaded, but in this context there's no indication you were deliberately hiding something. I don't think the other side is saying it. No. Right. But we'll use the word suppressed because that's the Brady lingo with the qualifier that everybody understands there's no nefarious nor that imputed to you. Those suppressed documents, you just heard Mr. Boyle give what he says is the best example of an exculpatory document that he's client's prejudiced for not having received. Can you meet his argument head on and explain why what he cited doesn't meet all the standards for a Brady violation leading to reversible error? Yes, Your Honor. The documents we made available to defense counsel, which were the 70 boxes at IRS offices from the search warrants conducted at CTC, as well as numerous trial transcripts, and we produced trial transcripts from four different CTC trials, the Crim case, Farnsworth, Gustafson, the Anthony case. Those were all produced via email, almost all via searchable PDF form. They all describe the same types of information. In fact, I provided four days of trial transcripts for Wayne Reebok, the main cooperating defendant that defense counsel takes issue in terms of them being able to cross-examine him with some of these suppressed materials. Throughout those four days of cross-examination, he was attacked by four different defense counsel on exactly this issue. I believe it's in our section of our brief we cite a number of materials that are very cumulative of this type of information. For instance, just to put a point on it, is the central your best argument that these are not material because they were cumulative and this point was beaten and beaten and beaten on at the trial? Am I characterizing correctly the government's argument, not material because cumulative? I would say not cumulative as well as not material because they would not change the outcome of the trial whatsoever. The jury heard over three weeks. Did you just misspeak? You said not material. No, I think you said not cumulative, but you're agreeing it is cumulative or you're saying it is cumulative. She said not cumulative. Correct, Your Honors. I'm saying it is not material. And some of the confusion for my part sometimes is that cumulativeness is sometimes addressed in suppression prong, not a three-braided prong. Sometimes it's addressed in materiality prong. But here, no matter where you put it, these materials were cumulative of materials provided directly to defense counsel or made available and at the same time they would not have made any difference at trial given the avalanche of bad faith evidence that we put out regarding the appellant, Craig Betterman. So you were saying cumulative but not material. Cumulative and not material, I would say, Your Honors. So the reasons why it's not material would be because it's cumulative and because it would not have had any effect given the avalanche of bad faith and cautiousness of guilt evidence of the defendant, which we cite in our briefing. So just as an example, in our trial, the Betterman's trial, we admitted on a cross-examination by Mr. Boyle that he told clients that trustees had to be involved in the decisions they made. So that's an example right there of he's already fallen on the sword at that point during our trial, as well as the four days of cross-examination we provide often on that very same point in the crim trial. Again, the Farnsworth trial, another trial transcript that was provided to them. In addition to that, we also have the appellant's statements that were introduced at trial where he says, I put a new roof on my house. Trustees never asked. I give out scholarships to my kids, quote-unquote scholarships, which were a sham. Trustees never asked. Another friend asks the appellant at trial, well, what happens if you want to put a new deck in your house? Do you have to ask the trustees? And the appellant answered no. But these are all part of the trial testimony. So the trustees were clearly just the face of commonwealth to try to put a veneer on it. But clearly, as the defendant demonstrated throughout the way he acted at trial, through the trial evidence, he devised an end-run around an IRS levy by setting up a shell company and instructing customers to pay that. Two different accountants put the defendant on notice of the fact that he was asking them to prepare false tax returns. They both fired him. One of those was a hand-picked accountant by CTC. Another accountant repeatedly told the appellant year after year that he didn't want to get anywhere near his business in preparing tax returns. Three different IRS revocations. You have a lot of evidence. Yes, sir. Okay. Talk to us for a minute about the best evidence rule and the hearsay. You made the assertion at trial, and you got the district court to agree with you, that because there was a hearsay exception, co-conspirator exception, you didn't have to worry about the best evidence rule. Is the government's position still today that a co-conspirator hearsay exception overrides the best evidence rule? Your Honor, we're not able to find a case on point on that. We are addressing entirely a harmless error here, both because the appellant testified in the very same parts of the manual that Agent Houston described, as well as introducing the two manuals themselves that Agent Houston was describing, as well as the trial evidence, which I was recounting earlier. The overwhelming character of the evidence. That's right. Okay. But I think Your Honor was right on point. Both Your Honors were right on point in asking Mr. Boyle about that. Both the home study course and the handbook at 58-59, the appendix, and 56-67, 58-20, 59-34 to 35, they all contain the same types of statements that Agent Houston was describing. The district court correctly concluded he was wholly supported by those exhibits of the defense, and the district court correctly stated that many of those statements that the agent attributed to the manuals were exactly as he described. I'm just trying to figure out what happened here. You waited until what, June 2012? It was almost a year after the district court heard evidence on post-trial motions to turn over additional documents, including memorandum interviews, et cetera. What happened there? What happened there, Your Honor, is I was not the original prosecutor on both the Bitterman case and the Crim case. I came in later on both cases. I tried the Crim case. I came in a couple months before trial with co-counsel. Following that, I was also in charge of the Bitterman case. When I went through the discovery we provided in the Bitterman case, and I would take issue with the hundreds of thousands of documents that the appellant argues about was a distraction, but I can get to that later. To answer Your Honor's question, I did not realize that the same witnesses, Agent Houston being one of them, who testified in the grand jury for the Bitterman case, had previously given grand jury testimony about the Bittermans for the previous prosecutor. I was not aware of that. I had not seen those in our file rooms. I stumbled across those. When I found those, I immediately notified Mr. Boyle's co-counsel and made those available to them. But as we stand here today, none of those materials have ever been asserted to be material in this appeal or even in the district court. I mean, from your perspective, thank goodness. Yes, Your Honor. No question. I would much rather not be standing here after the last five years of post-trial litigation, but this is where we are. Yeah, I mean, I would imagine your position, the great fear that one has, is the Stevens case type of situation. No question, Judge. It ain't good. I have no further questions. I don't have any more questions. Thank you very much. I may have pleased the Court. There are just a couple of things that I would like to say to the Court. First of all, I do not believe Mr. Agari ever intentionally suppressed evidence. I mean, that's not my allegation. I think that Mr. Agari is an honorable guy. I think he intended to give us the information that we did not receive. So I don't have any, I don't want to malign him by using the term. No, no. We're all on the same page. Well appreciated. Having said that, it's always difficult after the fact, I believe, to say what evidence would have made a difference, what evidence wouldn't have made a difference. The significance of this evidence, in my opinion, Your Honor, is first of all, Wayne Reebok had this. It was in writing. It was in emails. Respond to Mr. Agari's point that Reebok said on the stand and was cross-examined on the point that he said, yeah, I told Craig Bitterman these trustees are all, I won't do justice to it, but he acknowledged that trustees believed they were doing the right thing or in some fashion were, he told Bitterman they were acting in the role of trustees. If that is the representation that Mr. Reebok makes on the stand and you have the chance to cross-examine him on that, and that's even better evidence than the email you read to us from this podium a moment or two ago because it's acknowledged to be directly to Mr. Bitterman and it's a more emphatic statement of the role of the trustees. If all that's true, then what's the extra thing that you get from the email you just cited that isn't cumulative and cumulative in a weaker way, like it's weak sauce next to what Reebok admitted on the stand? What Reebok admitted on the stand was that he had made numerous false statements, that he had repeatedly put out memoranda and things that were false, but that everybody knew it and that everybody understood this to be a tax fraud. What these written documents show is that not everybody understood it to be a tax fraud. Some people understood it to be a legitimate thing. What does that have to do with your client, though? Assume that there were a trustee out there who thought it wasn't a fraud. If the point is that Bitterman thought it was a fraud and that Reebok was saying things that were even more emphatic than this trustee said about, oh, oh, it's all good, it's not a fraud, why does it exculpate your client in any meaningful sense? What's the argument for why that would make the jury go, ah, oh, I see. Because Reebok had testified that the trustees were not actually trustees and were not actually doing the job. In my mind, what that does for Craig Bitterman is Craig Bitterman's testimony was, oh, there were trustees, we had to answer to the trustees, the trustees were the ones who were responsible. What these documents show, and you asked me to give me my best one, but there's a significant number of them, but what all these documents show is that there were trustees, that they were complaining, that they thought that this was a legitimate thing, just as Craig Bitterman had been told it was a significant thing by Bitterman. It also opened up the possibility of calling these people as witnesses to testify as to what they understood their jobs to be. So I think it opened up a whole new line of questioning. Did the defense call any trustees? We did not call any trustees, Your Honor. We did not believe that there were any trustees. We believed that they were people who were doing what the government said they were doing based upon the discovery that had been provided to us. Thank you very much. Thank you, Your Honor. Thank you to both counsel for well-presented arguments. We'll take the matter under advisement. And Judge Greenberg, we'll give you a call in just about ten minutes. Okay. Thank you. Thank you. All right. Thank you.